UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

    - against -

TYSHAWN AUGUSTUS,

           Defendant.
------------------------------------------------------------X

**MEMORANDUM AND ORDER**
10-CR-629 (RRM)

ROSLYNN R. MAUSKOPF, United States District Judge.

Defendant Tyshawn Augustus moves, pursuant to Federal Rule of Criminal Procedure 12(b)(3) and the Fifth Amendment of the United States Constitution, to suppress certain statements that he made during his transfer from state to federal custody on July 14, 2010, as the product of unlawful custodial interrogation. (Doc. No. 18.) The Court held a two-day hearing at which two witnesses testified: New York City Police Department ("NYPD") Detectives Robert Negron ("Negron") and Joseph Fazzingo ("Fazzingo"). For the reasons below, defendant's motion is GRANTED in part and DENIED in part.

## FINDINGS OF FACT

**I.    NYPD's Brooklyn South Narcotics**

Detective Negron, employed by the NYPD since 2000 and a detective for the last five years, is currently assigned to Brooklyn South Narcotics. (Hr'g Tr. at 7.) Within that command, Negron is assigned to a "module" responsible for the 76th and 78th Precincts, and was the lead investigator responsible for gathering information regarding drug and gun activity at the Red Hook Houses, a public housing development located in the 76th Precinct. (*Id.* at 44, 64-66, 79.) Also assigned to this module were Detective Ricardo Nunez ("Nunez"), Negron's partner, and Detective Paul Farella ("Farella"). (*Id*. at 65-66.) Over his career, Negron has participated in over four-hundred arrests, including approximately five to ten federal arrests, all in the Eastern

1

District of New York. (*Id.* at 7, 18.) He has never been cross-designated as a federal agent. (*Id.* at 80.) Negron had never seen or met defendant Tyshawn Augustus until July 14, 2010, the date of defendant's arrest on federal charges. (*Id.* at 9.)

Fazzingo is a twenty-year veteran of the NYPD and has been assigned to various commands including the 76th Precinct and Brooklyn South Narcotics. (*Id.* at 78-79.) Fazzingo is currently assigned to the Brooklyn South Narcotics Major Case Squad, and the Red Hook Houses is a focus of that squad. (*Id.*) Because he is "deputized" or "cross-designated" to make federal arrests, he has participated in approximately two-hundred federal arrests, all within the Eastern District of New York. (*Id.* at 79-80.) As discussed more fully below, Fazzingo served as liaison between the NYPD and federal authorities regarding the investigation of defendant, swore out a federal arrest warrant for defendant and was responsible for processing defendant's federal arrest. (*Id.* at 80-81, 91-92.) Having worked in the same area for 20 years, Fazzingo "knew of" Tyshawn Augustus and knew he was "a drug dealer." (*Id.* at 90-91.)

**II. The Search of 774 Henry Street, Apartment 1A**

On June 4, 2010, the NYPD executed a state-court authorized search warrant at 774 Henry Street, Apartment 1A, Brooklyn, New York. (Affidavit of Joseph Fazzingo ("Fazzingo Aff.") at ¶ 1.) The warrant was executed by Detective Ricardo Nunez and other NYPD personnel. (Hr'g Tr. at 27.) Neither Detective Negron nor Detective Fazzingo participated in the execution of this warrant. (*Id.* at 27, 44) The search uncovered, *inter alia*, narcotics, a firearm, mail addressed to the defendant and defendant's photographic identification card from New York City Parks & Recreation. (Fazzingo Aff. at ¶¶ 3-5.) No occupants were present during the search, and the only tenant listed in public housing records for Apartment 1A had been deceased since 2009. (*Id.* at ¶¶ 1, 6.)

### III. Federal Arrest of Tyshawn Augustus

As the liaison between the NYPD and the United States Attorney's Office, Fazzingo learned about the search warrant and the ensuing investigation related to defendant Tyshawn Augustus. (Hr'g Tr. at 80-81.) On June 28, 2010, based on a sworn affidavit by Fazzingo detailing the results of the search warrant and other information, Magistrate Judge Lois Bloom issued a federal arrest warrant for Tyshawn Augustus. (Gov. Ex. 1.) Fazzingo testified that Negron was the source of the detailed information contained in Fazzingo's affidavit. (Hr'g Tr. at 81, 93-94.)

Negron initially attempted to minimize his role in the investigation by testifying that: (1) he had no involvement in the investigation of defendant prior to July 14, 2010, the day of defendant's arrest (*id.* at 26-28); (2) he was chosen to execute the arrest warrant merely because it was Fazzingo's warrant and he and Fazzingo worked together (*id.*); and (3) he did not talk to Fazzingo prior to executing the arrest warrant (*id.* at 30). He also attempted to minimize the importance of connecting Augustus to the evidence seized pursuant to the search warrant. (*Id.* at 41-43.) The Court does not credit Negron's testimony on these points. Rather, as discussed more fully *infra*, the Court finds credible Negron's testimony, given on cross-examination, in which he testified that even prior to the issuance of the federal arrest warrant, and certainly before July 14, 2010, he was intimately familiar with the evidence uncovered in the search of 774 Henry Street, Apartment 1A and in the related investigation, including the evidence directly connecting defendant to that apartment. For example, Negron testified that, even prior to the issuance of the arrest warrant, Negron knew that the search uncovered drugs and a firearm in an empty apartment, one that was last listed to a person who had died years earlier. Negron also knew that the police recovered mail addressed to Augustus, evidence of attempts to deliver other

pieces to him at Apartment 1A, and a parks department identification in defendant's name. (*Id.* at 41-42, 44-46.) Negron also knew that the defendant had received a summons after the search warrant was executed, as he was the one who got a copy of it, which Negron was sure contained residency information. (*Id.* at 62.) As further evidence of Negron's involvement with and knowledge of the investigation leading to defendant's arrest, Negron testified that he knew he would find the defendant at Rikers Island because he had been previously made aware of defendant's arrest on the unrelated charges. (*Id.* at 56-57, 59-60.) As Negron testified, he was the "lead investigator in an ongoing investigation in Red Hook, and the search was executed in Red Hook." (*Id.* at 43-44.) Indeed, as he testified, Negron had presented that information to an AUSA who had already been assigned to the investigation in an effort to secure a federal arrest warrant for Augustus. (*Id.* at 43-49.)[1] Thus, based on totality of the credible testimony, the Court finds that prior to July 14, 2010, both Negron and Fazzingo were familiar with the key details of the investigation of the defendant, including all of the facts detailed in Fazzingo's affidavit in support of the arrest warrant.

On July 14, 2010, Detectives Negron and Farella went to Rikers Island to pick-up defendant and transport him to the Eastern District courthouse for federal arraignment. (Hr'g Tr. at 7-10, 84-85.) Fazzingo had lodged the warrant at Rikers Island where defendant was being held on unrelated charges, (*id.* at 57, 84) and asked Negron to pick up the defendant from Rikers Island because Negron was "more familiar with the Red Hook Houses case" (*id.* at 86). Upon arriving at Rikers Island, Negron provided a copy of the arrest warrant to a corrections officer. (*Id.* at 9-10). A short time later, defendant was produced and Negron placed defendant in his

---

[1] Indeed, the information contained in Fazzingo's affidavit in support of the arrest warrant is the very information Negron testified he conveyed to the federal prosecutors before that warrant was issued.

4

minivan for transport.  (*Id.* at 10.)  Though he had never met Augustus before, Negron was confident that he had in his custody the individual wanted on the warrant.  (*Id.* at 57-59.)

### IV. Defendant's Statements to Detective Negron

The ride from Rikers Island to the courthouse took approximately forty-five minutes to an hour.  (*Id.* at 61.)  At no time was defendant read his *Miranda* rights, nor was he told why he was being arrested.  (*Id.* at 4, 13, 62.)  The parties' have stipulated, and the facts clearly demonstrate, that defendant was in custody throughout his entire encounter with the NYPD detectives on July 14, 2010.  (*Id.* at 3-4.)  During the ride, the two detectives did not speak with one another, and Farella never spoke with the defendant.  (*Id.* at 10, 61.)

At some, unspecified point during the ride, Negron asked defendant questions regarding "basic pedigree information" including "[n]ame, date of birth, address, social security number, [and] telephone."  (*Id.* at 10-11.)  Negron testified that he asked the questions to "gain knowledge of who . . . is in custody."  (*Id.* at 11.)  He recorded defendant's responses on a "random white piece of paper," which he subsequently lost, and made other related notations in his memo book which was also lost in an office move together with other official paperwork.  (*Id.* at 11-12, 23-25.)

Negron recalled that in addition to providing his name, defendant answered that he lived at 774 Henry Street, Apartment 1A, and that he provided a phone number that Negron could not remember.  Negron did not recall whether defendant provided a social security number.  (*Id.* at 22.)  According to a written complaint follow-up report prepared by Negron several hours after he spoke to defendant in the minivan (*id.* at 14), defendant told Negron that defendant lived at "774 Henry Street [Apartment] 1A" and that he had "lived there with his grandmother but she

5

died about a year ago."² (Gov. Ex. 3.) The complaint follow-up report was prepared at the request of the assigned Assistant United States Attorney "to denote the occurrence that had taken place, statements by the defendant." (Hr'g Tr. at 49.) In explaining why the complaint follow-up report omitted certain pedigree information defendant had given, including his phone number, Negron stated that the complaint follow-up report "is a synopsis of what had happened" and "pedigree information is more thorough than what's given on the statement." (*Id.* at 50-51.)

Other than asking basic pedigree questions, Negron did not conduct any further questioning of defendant. (*Id.* at 13.) However, according to Negron, sometime during the ride to the courthouse, defendant asked Negron what he was being arrested for, and asked further "if this was related to the police smashing down his door." (*Id.*) Negron understood this as a reference to the execution of the search warrant at Apartment 1A. (*Id.*) Negron further testified that defendant "asked if I knew where he [Augustus] lived, why did I take so long to find him because he [Augustus] had been issued a summons at a later date." (*Id.* at 13-14.) These statements were memorialized in the same complaint follow-up report.³ (*Id.*) Though Negron could not recall whether this statement was made before or after he questioned defendant, the complaint report records these statements after those given in response to pedigree questioning. (*Id.* at 61-62; Gov. Ex. 3.)

---

² During his entire testimony, Negron makes no mention of that portion of defendant's statement relating to his grandmother. As the Court is suppressing all of defendants statements made to Detective Negron, the Court need not address this discrepancy.
³ The statements were memorialized in the complaint report as follows: "Is this from when you guys hit my apartment, i'm confused why would you wait so long to get me, i got a summons after my door was hit." (Ex. 3.) There is no mention of defendant asking why he was being arrested.

### V. Statements to Detective Fazzingo

Fazzingo took custody of defendant from Detectives Negron and Farella upon their arrival at the courthouse and began the routine federal booking process.[4] (Hr'g Tr. at 88-89.) As part of that process, Fazzingo asked defendant pedigree questions from the federal booking form, "USMS - 129/312 Prisoner Intake," which he had in hand and completed contemporaneously. (*Id.* at 88-89, 98-101; Gov. Ex. 4) While completing the form, Fazzingo spoke directly to defendant and received all of the information, aside from one telephone number, from defendant. (Hr'g Tr. at 89, 101.) Both Negron and Fazzingo testified that Fazzingo did not use any of the information collected by Negron, nor did Negron share with Fazzingo any of the information Negron had already obtained. (*Id.* at 33, 89.) Fazzingo had to conduct the federal booking process himself because Negron was not authorized to conduct a federal booking - - Negron was neither a federal agent nor a cross-designated agent. (*Id.* at 87.) Unlike the reports completed by Negron, which indicate defendant's exact address, including the apartment number, the USMS form completed by Detective Fazzingo only indicates a street address - - 774 Henry Street - - and omits any reference to an apartment number at that location. (Gov. Exs. 2-4.)

### VI. Detective Negron's On-Line Booking Sheet

Later that evening, Negron went to the 76th Precinct and completed a NYPD "online booking sheet."[5] (Hr'g Tr. at 14, 34; Gov. Ex. 2.) Both Negron and Fazzingo testified generally that while such a report is required as part of the routine booking process for non-federal arrests,

---

[4] As a cross-designated NYPD detective, Fazzingo has the authority to conduct a federal booking. (Hr'g Tr. at 80, 87-88.)
[5] Negron believes he attended defendant's arraignment before the Magistrate Judge, after which Negron and another law enforcement officer took defendant to the hospital to be treated for a jaw problem. However, it is clear that the On-Line Booking Sheet was prepared *after* defendant had been processed through the federal system. (*Id.* at 14-15, 52-56.)

7

it is not unusual for an NYPD officer to create such a booking sheet when he or she assists in a federal arrest. (Hr'g Tr. at 15, 21, 63-64, 97-98.) However, Negron's testimony as to the purpose of the booking sheet in this context - - the transfer of a state prisoner to federal custody - - is, again, contradictory. Though Negron testified on direct that the booking sheet is "required" by the NYPD, on cross-examination he testified that such a report "was not necessary" because the federal marshals booked the arrest in their system and that "relieve[d] [him] from [his] responsibilities to do [his] own booking." (*Id.* at 21, 55-56, 63-64.) In addition, Negron acknowledged that completing the booking sheet would allow defendant's arrest to be included in Negron's total number of arrests, thus giving Negron "credit" for an arrest that was processed within the federal system. (*Id.* at 55-56.)

Negron's On-Line Booking Sheet for defendant's arrest also reflects that defendant resides at 774 Henry Street, Apartment 1A. (Gov. Ex. 2.) However, the booking sheet also contains multiple inaccuracies. For example, it lists the "Arrest Location" both as inside a police precinct and on a "public sidewalk," and it lists the "Offense Location" as inside a police precinct. He lists the offense occurrence date and time as July 14, 2010 at 1:00 pm. Negron was unable to explain these errors, and testified that he did not even attempt to enter the actual location of the arrest. (Hr'g Tr. at 37-38.)

## DISCUSSION

### I. Burden of Proof on a Motion to Suppress

On a motion to suppress evidence, once the defendant establishes a basis for his motion the burden shifts to the government to prove, by a preponderance of the evidence, the legality of the actions of its officers. *See United States v. Wyche*, 307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004). Once the defendant satisfies his initial burden of production by "alleging custodial

8

interrogation in the absence of proper *Miranda* warnings," the burden "shifts to the Government to prove *Miranda* voluntariness by a preponderance of the evidence, either because there was no custodial interrogation implicating *Miranda*, there was some exception to the *Miranda* rule, or because [defendant was] properly *Mirandized* and waived [his] rights." *United States v. Murphy*, 778 F. Supp. 2d 237, 257-58 (N.D.N.Y. 2011) (quotation marks omitted); *see also United States v. Miller*, 382 F. Supp. 2d 350, 360-362 (N.D.N.Y. 2005) (finding defendant's "personal affidavit" alleging pre-*Miranda* police questioning satisfied burden of production).

On February 25, 2011, defendant submitted a personal affidavit in support of his suppression motion. (Affidavit of Tyshawn Augustus (Doc. No. 28).) The affidavit indicates that on July 14, 2010, defendant was arrested, was asked questions, responded to those questions and was not read *Miranda* warnings prior to the questioning. *Id.* The parties have also stipulated that defendant was questioned while in custody and that he was not given *Miranda* warnings prior to questioning. (Hr'g Tr. at 3-4.) The Court finds defendant has met his burden and that the government must prove, by a preponderance of the evidence, that the statements in question are nevertheless admissible.

**II.     Defendant's Statements to Detective Negron**

Defendant moves to suppress all statements made to Negron during defendant's transport from Rikers Island to federal custody as reflected on Negron's complaint follow-up report. (Def. Mem. (Doc. No. 39) at 3.) Those statements include defendant's answers to pedigree questions, such as his address, apartment number and statement that he lived there with his grandmother, as well as so-called "spontaneous" statements in which defendant asked Negron "[i]s this from when you guys hit my apartment, [I']m confused why would you wait so long to get me, [I] got a summons after my door was hit." (Gov. Ex. 3.)

9

Defendant argues that because Negron was not part of the federal booking process, his questioning cannot fall under the "booking exception" and that even if it did, Negron's direct involvement in the case meant he should have known such questions would elicit an incriminating response. (Def. Mem. at 21-32.) Defendant also argues that his additional statements were a direct product of Negron's impermissible interrogation, and not, as the Government argues, spontaneous, voluntary statements unprovoked by impermissible interrogation. (*See id.* at 32-34; Gov't Br. (Doc. No. 40) at 24-26.) For the reasons set forth below, the Court finds that all of defendant's statements to Negron must be suppressed.

### a. Pedigree Questioning

It is well-established that "'the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards' . . . includ[ing] the now familiar *Miranda* warnings." *Rhode Island v. Innis*, 446 U.S. 291, 297 (1980) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). The term interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Id.* at 301. As the definition of interrogation suggests, courts have recognized a "routine booking question" exception which exempts from *Miranda's* coverage "questions to secure the biographical data necessary to complete booking or pretrial services." *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (plurality); *see also United States v. Carmona*, 873 F.2d 569, 573 (2d Cir. 1989) (finding questions not "intended . . . to elicit a confession or incriminating information," but meant to gather the "sort of basic information needed to facilitate the booking and arraigning of a suspect" do not violate *Miranda*). The key distinction is between "interrogation of an investigative

10

nature," and questioning to obtain "basic identifying data required for booking and arraignment." *United States ex rel. Hines v. LaVallee*, 521 F.2d 1109, 1113 (2d Cir. 1975); *see also United States v. Gotchis*, 803 F.2d 74, 79 (2d Cir. 1986) (finding questions about marital status fall within the "benign category of basic identifying data required for booking and arraignment" (quotation marks omitted)).

The exception for so-called pedigree information does not provide police officers carte blanche to ask questions "designed to elicit incriminatory admissions." *Muniz*, 496 U.S. at 602 n.14; *see also Rosa v. McCray*, 396 F.3d 210, 222 (2d Cir. 2005) (finding that "of course recognizing a booking exception to *Miranda* does not mean . . . that any question asked during the booking process falls within that exception" (quotation marks omitted)). Whether a question falls under this exception is an "objective inquiry" focusing on whether "the police [should] have known that asking the pedigree questions would elicit incriminating information." *Rosa*, 396 F.3d at 222 (quotation marks omitted); *see also Innis*, 446 U.S. at 301-302 & n.7-8. However, the fact that the "information gathered turns out to be incriminating in some respect does not, by itself, alter the general rule that pedigree questioning does not fall under the strictures of Miranda." *Rosa*, 396 F.3d at 221.

Examining the totality of the circumstances, the Court concludes that Negron's pedigree questioning does not properly fall within the booking exception, and was designed to elicit an incriminating response. At its core, Negron's questioning had nothing to do with processing the federal arrest. As the uncontroverted testimony demonstrates, Negron was not authorized to book a federal defendant and none of the information he gathered was used in the federal booking process. It was Fazzingo alone who had the authority and was responsible for processing defendant's federal arrest. And, as discussed more fully below, Fazzingo obtained

11

the information required on the USMS 129/312 form by questioning defendant himself, at the federal courthouse, as part of the regular, routine booking of a federal prisoner. (Hr'g Tr. at 15, 33, 87-89.)

The fact Negron created an NYPD online booking sheet does not change the inquiry. Certainly the "routine booking question" exception "does not depend on the filing of a piece of paper or some time-span the Defendant argues is sufficient for 'booking.'" *See United States v. Pabon*, 603 F. Supp. 2d 406, 410-11 (N.D.N.Y. 2009) (finding a question asked for "legitimate processing purposes" fell under the exception). Rather, the exception "exempts from Miranda's coverage biographical data necessary to complete booking or pretrial services" and permits questions "that appear reasonably related to the police's administrative concerns." *Rosa*, 396 F.3d at 221 (citing *Muniz*, 496 U.S. at 601-02) (quotation marks omitted). On this record, the government has failed to establish any legitimate police administrative concern that required Negron to elicit pedigree information from a defendant being transferred into federal custody.

At best, the testimony of both Negron and Fazzingo established that creation of an On-Line Booking Sheet in the context of such transfers was a common practice (H'rg Tr. at 15, 55-56, 63-64); but nothing in the record, other than the detectives' self-serving and conclusory statements, establishes that it was required. Moreover, the booking sheet was created well after the defendant had appeared before the federal magistrate judge and the bail determination had been made, and was fraught with basic and pervasive errors that belie its legitimate administrative significance. (*Id*. at 23-24, 37-38; Gov. Ex. 2.) Tellingly, Negron candidly testified on cross-examination that a purpose of the On-Line Booking Sheet was to ensure that Negron got "credit" in his tally of arrests. (H'rg Tr. at 55-56.) While maintaining accurate statistics about the results of a detective's investigative efforts is a laudable administrative

concern of both the police department and the individual detective, there are certainly other ways to achieve this goal without subjecting a defendant in custody to questioning - - even about seemingly benign pedigree information.

Indeed here, defendant's responses regarding his place of residence were highly incriminating. They directly tied defendant to the unoccupied apartment in which drugs and guns were found, and to its former tenant who had recently died. These admissions provided valuable information that corroborated other evidence obtained during the course of the police investigation, and filled significant gaps in the proof against defendant. While the mere fact that defendant's answers were incriminating does not render them inadmissible, *see Rosa*, 396 F.3d at 221, a reasonable officer in Negron's shoes could hardly be blind to the import of such admissions.

As the credible evidence demonstrates, Negron played a prominent role both in the compilation of investigative information about drug and gun activity in the Red Hook Houses, and in the investigation of this defendant. By the time of Augustus's arrest on July 14, 2010, Negron was the lead investigator in charge of the NYPD's investigation of defendant. And at the time he questioned defendant on the trip from Rikers Island to the federal courthouse, Negron was intimately aware of the evidence - - and lack thereof - - against Augustus, including the results of the search warrant executed at the Henry Street apartment, the content of the tenant records related to that apartment, and Augustus's residency information from a summons that Augustus received and which Negron himself had retrieved. It was Negron who first informed Fazzingo about the case, and it was Negron who provided Fazzingo with the detailed results of investigation used by Fazzingo as the basis for his sworn affidavit in support the arrest warrant. (Hr'g Tr. 44-46, 80-83, 93-94.) As he testified, Fazzingo selected Negron to go to Rikers Island

13

to pick up the defendant on the warrant, which had already been lodged, because Negron was "more familiar with the Red Hook Houses case." (*Id.* at 86.)

Objectively viewing all of the circumstances surrounding Negron's questioning, and finding no legitimate administrative purpose therefore, the Court concludes that Negron's seemingly innocuous pedigree questioning was designed to elicit an incriminating response. As this Court must guard against the "possibility of abuse by police who might, under the guise of seeking pedigree data, elicit an incriminatory statement," *see LaVallee*, 521 F.2d at 1113 n.2, the Court suppresses defendants statements made in response to Negron's pedigree questioning.

### b. Defendant's "Spontaneous" Statements to Negron

Defendant also seeks to suppress additional statements made to Detective Negron during the ride to the federal courthouse. The Government claims these statements were spontaneous and not prompted by any questioning or interrogation on the part of the transporting detectives. As *Miranda* itself recognized, "[v]olunteered statements of any kind are not barred by the Fifth Amendment" and thus do not require preliminary advice of rights. *Miranda*, 384 U.S. at 478. That is, a statement must be the product of interrogation - - "express questioning or its functional equivalent" - - to be procured in violation of *Miranda*. *Innis*, 446 U.S. at 300-301. "Interrogation includes both "express questioning as well as 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Montana*, 958 F.2d 516 (2d Cir. 1992) (quoting *Innis*, 446 U.S. at 301).

Here, the government has failed to demonstrate that the defendant's so-called "spontaneous" statements were not the product of Negron's improper pedigree questioning. The Government did not even elicit from Negron testimony regarding the content of these statements,

14

nor did they elicit the context in which they were made, other than to establish that Negron did not ask Augustus questions other than those related to pedigree.[6] (Hr'g Tr. at 13.) Instead, the government introduced these statements into evidence solely through Negron's complaint follow-up report in which these statements were memorialized.

The evidence before the Court demonstrates only that at some point during a forty-five minute to one-hour van ride, defendant was questioned by Negron about where he lived, and, in addition to answering those questions, defendant made other statements related to his residence. (Hr'g Tr. 13-14, 61-62; Gov. Ex. 3.) The record is devoid of when - - either during the trip as a whole or in relation to Negron's pedigree questioning - - these additional statements were made. Negron had no independent recollection of when, in relation to one another, defendant made his various statements.[7] (Hr'g Tr. at 62.) There is no evidence to suggest that the additional statements were uttered after a temporal break from such questioning, or whether any words or actions of the officers prompted defendant's comments. To the contrary, on their face, the statements at issue bear a strong "'rational relationship to the impermissible question that preceded [them].'" *United States v. Taylor*, No. 11 Cr. 310(PGG), 2011 WL 4357350, at *7 (S.D.N.Y. Sept. 19, 2011) (quoting *United States v. Miller*, 382 F. Supp. 2d 350, 374-75 (N.D.N.Y. 2005)). Thus, on the record before this Court, the Government has failed to demonstrate that these additional statements were not a "'natural continuation of the earlier question.'" *Id*. As such, defendant's motion to suppress these statements is also granted.

---

[6] The only other relevant context, elicited on cross-examination, was that Negron did not tell Augustus the charges for which he was being arrested. (Hr'g Tr. at 62.)

[7] In fact, defendant suggests that the order in which the statements were memorialized in the complaint follow-up report reflect the order in which the statements were made; that is, that the spontaneous statements were made *after* defendant's responses to pedigree questioning. (Def. Mem. at 34.) Such an inference would help bolster the relationship of these statements to Negron's impermissible pedigree questioning, and underscores the Government's lack of proof toward its burden.

### III. Defendant's Statements to Fazzingo

Defendant also moves to suppress statements he made at the courthouse in response to Fazzingo's pedigree questioning. Defendant argues that given Fazzingo's knowledge of the case, Fazzingo, too, should have known that questioning defendant about his address and telephone number was likely to elicit an incriminating response. (Def. Mem. at 35-37.) On the record here, the government established, by a preponderance of the evidence, that Fazzingo was conducting the required, routine federal booking process and narrowly confined his questions to the information required for that process. As such, the statements to Fazzingo fall within the pedigree exception to *Miranda*.

The uncontroverted testimony clearly established that, as the NYPD detective cross-designated as a federal agent, Fazzingo's role on July 14, 2010 was to handle the booking of defendant in the Eastern District of New York, a process with which Fazzingo was fully familiar. Fazzingo met defendant at the courthouse with the "USMS - 129/312 Prisoner Intake" form, and proceeded to ask only the questions required by the form as he completed it.[8] (Hr'g Tr. 88-89, 100; Gov. Ex. 4); *Rosa*, 396 F.3d at 221-222 (finding pedigree questioning permissible because it was "in the exact order that the questions appeared on the booking form and without any substantive deviation from the form of the questions presented" and because it was "narrowly crafted by the officer to obtain the information necessary to complete the booking form"); *Pabon*, 603 F. Supp. 2d at 411 (finding pedigree questioning permissible where "questions were asked in order corresponding to the order in which the questions appeared on the form" and were "narrowly tailored" to completing the form "accurate[ly]"). That Fazzingo was familiar with the

---

[8] The fact that defendant apparently made none of the highly incriminating statements that he made to Negron in response to Fazzingo's questioning reinforces the Court's conclusion that Fazzingo's questioning was routine and "narrowly crafted." Indeed, the USMS Form completed by Fazzingo - - unlike everything filled out by Negron - - suggests that defendant did not provide to Fazzingo the most incriminating aspect of his pedigree - - his apartment number - - even though the form called for this information. (Gov. Ex. 4.)

16

details of the underlying investigation culminating in defendant's arrest does not change the result. Fazzingo's role in the investigation was much more limited than that of Negron. His questions were precisely those required for the booking process and no more, and were "reasonably related to the police's administrative concerns." *Rosa*, 396 F.3d at 221

Finally, defendant correctly points out that his address is relevant to his prosecution because of the contraband seized from it. However, Fazzingo's narrowly tailored questioning was not about his ownership of the contraband, but merely his address, as required for the federal booking. *Pabon*, 603 F. Supp. 2d at 411 (finding officer could clarify defendant's address even though contraband had been seized from it because an accurate address was necessary for booking and officer narrowly tailored his question to address rather than possession). Further, while defendant's address may be part of establishing his ownership of the contraband, the fact that defendant's address may "turn[] out to be incriminating" information does not put Fazzingo's questioning impermissibly beyond the scope of the booking exception. *Rosa*, 396 F.3d at 221.

Thus, because Fazzingo was conducting the routine federal booking process and narrowly confined his inquiries to those required for completion of the booking paperwork, defendant's responses to Fazzingo's questions are admissible under the booking exception, even though defendant was not advised of his *Miranda* rights. As such, defendant's motion to suppress his statements made to Fazzingo is denied.

## CONCLUSION

For the reasons set forth above, defendant's motion to suppress is GRANTED in part and DENIED in part.

SO ORDERED.

Dated: Brooklyn, New York
      August 3, 2012

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge